## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TARAS CEGLIA BOHONOK, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NIO INC., BIN LI, and WEI FENG,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Taras Ceglia Bohonok ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, Plaintiff's counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by NIO Inc. ("NIO" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by NIO; and (c) review of other publicly available information concerning NIO.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired NIO securities between August 20, 2020 and July 11, 2022, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      NIO designs, develops, manufactures, and sells smart electric vehicles.  It purports to differentiate itself through technological breakthroughs and innovations, such as its battery swapping technologies (i.e., Battery as a Service) and proprietary autonomous driving technologies, including Autonomous Driving as a Service.

3.      On June 28, 2022, Grizzly Research published a report alleging, among other things, that NIO inflated its net income by about 95% through sales to a related party, Wuhan Weineng Battery Asset Co. ("Weineng").

4.     On this news, the Company's American Depositary Shares ("ADSs" or "shares") fell $0.59, or 2.5%, to close at $22.36 per share on June 28, 2022, on unusually heavy trading volume.

5.     Then, on July 11, 2022, NIO announced that it formed a special committee to oversee an investigation into the allegations in the Grizzly Research report.

6.     On this news, the Company's shares fell $2.03, or 8.9% to close at $20.57 per share on July 11, 2022, on unusually heavy trading volume.

7.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that NIO pulled forward revenue by selling batteries to a related party, which owned the batteries and managed users' subscriptions; (2) that, through the related party, NIO also recognized enormous depreciation savings; (3) that, as a result of the foregoing, the Company's revenue and net loss were overstated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Taras Ceglia Bohonok, as set forth in the accompanying certification, incorporated by reference herein, purchased NIO securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant NIO is incorporated under the laws of the Cayman Islands with its principal executive offices located in Shanghai, China.  NIO's ADSs trade on the New York Stock Exchange ("NYSE") under the symbol "NIO."

15.     Defendant Bin Li ("Li") was NIO's Chief Executive Officer ("CEO") at all relevant times.

16.    Defendant Wei Feng ("Feng") was NIO's Chief Financial Officer ("CFO") at all relevant times.

17.    Defendants Li and Feng (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

18.    NIO designs, develops, manufactures, and sells smart electric vehicles.  It purports to differentiate itself through technological breakthroughs and innovations, such as its battery swapping technologies (i.e., Battery as a Service) and proprietary autonomous driving technologies, including Autonomous Driving as a Service.

### Materially False and Misleading
### Statements Issued During the Class Period

19.    The Class Period begins on August 20, 2020, when the Company issued a press release announcing the establishment of Weineng.  The press release stated, in relevant part:

NIO [. . .] today launched the innovative Battery as a Service (the "BaaS") subscription model and announced the establishment of Wuhan Weineng Battery Asset Co., Ltd. (the "Battery Asset Company").

The BaaS model allows users to purchase electric vehicles and subscribe the usage of battery packs separately. If users opt to purchase an ES8, ES6 or EC6 model and subscribe to use the 70 kWh battery pack under the BaaS model, they can enjoy the vehicle purchase price with an RMB70,000 deduction off the original price and pay a monthly subscription fee of RMB980 for the battery pack. Meanwhile, the users will continue to enjoy the existing favorable policies such as purchase tax exemption and government subsidies for EVs. The first vehicle under the BaaS model has completed the process of license plate registration, insurance purchase, and auto financing. All users who purchase NIO vehicles are now eligible to place orders with the BaaS model.

On August 18, 2020, NIO, Contemporary Amperex Technology Co., Limited ("CATL"), Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited (collectively the "Partners") jointly established the Battery Asset Company. NIO and the Partners will each invest RMB200 million and hold 25% equity interest in the Battery Asset Company respectively. The Battery Asset Company is dedicated to purchase and own the battery assets, and lease the battery packs to users who subscribe to the BaaS model.

"The BaaS model has long been planned with our unique battery swap technologies. The successful launch of the BaaS model will enable NIO users to benefit from the lower initial purchase prices of our products, flexible battery upgrade options and assurance of battery performance," said William Bin Li, founder, chairman, and chief executive officer of NIO. "As of today, NIO has deployed 143 battery swap stations across 64 cities in China, and completed over 800,000 battery swaps for our users. The advantages of our chargeable, swappable and upgradable battery swap technologies will continue to enhance competitiveness of NIO products, promote conversion to our premium smart EVs and create more values for our users."

20.    On November 17, 2020, NIO issued a press release reporting its Q3 2020 financial results. The press release stated, in relevant part:

**Financial Highlights for the Third Quarter of 2020**

*          *          *

- **Total revenues** were RMB4,526.0 million (US$666.6 million) in the third quarter of 2020, representing an increase of 146.4% from the third quarter of 2019 and an increase of 21.7% from the second quarter of 2020.

5

*          *          *

"We achieved a new record-high quarterly deliveries of 12,206 ES8s, ES6s and EC6s in total in the third quarter of 2020, followed by the best-ever monthly deliveries of 5,055 vehicles in October," said William Bin Li, founder, chairman and chief executive officer of NIO. "In view of the growing market demand for our competitive products, we are motivated to continuously elevate the production capacity to the next level. We expect to deliver 16,500 to 17,000 vehicles in the coming fourth quarter."

"In the past months, we are pleased to have launched the BaaS and the 100kWh battery pack with proprietary thermal management and significant performance enhancement. Enabled by our unique battery swap technologies, innovative BaaS model and comprehensive power solutions, our users can benefit from lower initial purchase prices of vehicles, flexible battery upgrade options as well as enhanced assurance of battery performance. Additionally, following the release of the NIO OS 2.7.0 via firmware-over-the-air (FOTA) upgrade in October 2020, our users have been able to enjoy the Navigate on Pilot (NoP) feature of NIO Pilot on highways and urban expressways in China. Going forward, we remain committed to deploying more resources into the core technology innovations and delivering the best holistic product and service experiences to our user community in the pursuit of fortifying our long-term competitiveness in the market," concluded Mr. Li.

"With another quarter of record high deliveries in the third quarter of 2020, plus further improvements in average selling price, material cost and manufacturing efficiency, our vehicle margin increased to 14.5%. Additionally, we achieved positive cash flow from operating activities for the second sequential quarter," added Steven Wei Feng, NIO's chief financial officer. "Our order growth momentum continued steadfastly, driven by the expanded brand awareness, growing user base, extended sales network and most importantly, the compelling products and technologies. Meanwhile, our continuous improvement of operational efficiency, cash flow and balance sheet has laid a solid foundation for our future sustainable growth and decisive investments in technologies."

21.     That same day, NIO hosted an earnings call with investors and analysts to discuss the Company's Q3 2020 results (the "Q3 2020 Earnings Call"). During the scripted portion of the Q3 2020 Earnings Call, Defendant Feng stated, in relevant part:

Our total revenues in the third quarter were RMB4.5 billion, or $666.6, representing an increase of 146.4% year-over-year, an increase of 21.7% quarter-over-quarter. Our total revenues are made of two parts, vehicle sales and other sales. Vehicle sales in the third quarter were RMB4.27 billion or $ 628.4 million, accounting for 94% of total revenues in the quarter. It represented an increase of

146.1% year-over-year and an increase of 22.4% quarter-over-quarter. The increase in vehicle sales year-over-year was primarily due to the increase in sales of ES6 and ES8.

22.     On March 1, 2021, NIO announced its fourth quarter and full year 2020 financial results in a press release that stated, in relevant part:

**Financial Highlights for the Fourth Quarter of 2020**

*     *     *

- **Total revenues** were RMB6,641.1 million (US$1,017.8 million) in the fourth quarter of 2020, representing an increase of 133.2% from the fourth quarter of 2019 and an increase of 46.7% from the third quarter of 2020.

- **Gross profit** was RMB1,141.9 million (US$175.0 million) in the fourth quarter of 2020, representing an increase of RMB1,395.7 million from a gross loss of RMB253.8 million in the fourth quarter of 2019 and an increase of RMB556.1 million from the third quarter of 2020.

*     *     *

- **Net loss** was RMB1,388.6 million (US$212.8 million) in the fourth quarter of 2020, representing a decrease of 51.5% from the fourth quarter of 2019 and an increase of 32.6% from the third quarter of 2020. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB 1,328.4 million (US$203.6 million) in the fourth quarter of 2020, representing a decrease of 52.8% from the fourth quarter of 2019 and an increase of 33.1% from the third quarter of 2020.

23.     On April 6, 2021, NIO filed its annual report on Form 20-F for the period ended December 31, 2020, affirming the previously reported financial results.  It also purported to warn of risks related to Weineng, stating in relevant part:

*We may face challenges providing the Battery as a Service.*

On August 20, 2020, we introduced the Battery as a Service, or BaaS, which allows users to purchase electric vehicles and subscribe the usage of battery packs separately. If users opt to purchase an ES8, ES6, EC6 or ET7 model and subscribe to use the 70kWh battery pack under the BaaS, they can enjoy an RMB70,000 deduction off the original vehicle purchase price and pay a monthly subscription fee of RMB980 for the battery pack. On November 6, 2020, we launched the 100kWh battery pack with battery update plans. If users opt to purchase an ES8, ES6, EC6 or ET7 and subscribe for the 100kWh battery pack under the BaaS,

they can purchase the vehicle without the battery pack while paying a monthly subscription fee of RMB1,480. Users who currently apply the 70kWh battery pack with the intention to upgrade their batteries can choose to either purchase a 100kWh battery pack for permanent upgrades or pay a monthly subscription fee of RMB880 for a flexible upgrade package.

Under the BaaS, we sell a battery pack to the Battery Asset Company, and the user subscribes to the usage of the battery pack from the Battery Asset Company. The service we provide to our users under the BaaS relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company with Contemporary Amperex Technology Co., Limited, or CATL, Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited, which we refer to as the Battery Asset Company Investors in this annual report. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in providing high-quality services to our users, we will suffer from negative customer reviews and even returns of products or services. If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and leasing them to our users, or otherwise maintain its healthy and sustainable operations. On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the Battery Asset Company Investors' investments in the Battery Asset Company. In addition, in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users, while the maximum amount of guarantee that can be claimed shall not be higher than the accumulated service fees we receive from the Battery Asset Company. As the BaaS user base is expanding, if an increased number of default occurs, our results of operations and financial performance will be negatively affected.

24.    On April 29, 2021, NIO announced its first quarter 2021 financial results in a press release that stated, in relevant part:

**Financial Highlights for the First Quarter of 2021**

*        *        *

- **Total revenues** were RMB7,982.3 million (US$1,218.3 million) in the first quarter of 2021, representing an increase of 481.8% from the first quarter of 2020 and an increase of 20.2% from the fourth quarter of 2020.

- **Gross profit** was RMB1,554.8 million (US$237.3 million) in the first quarter of 2021, representing an increase of RMB1,722.3 million from a

gross loss of RMB167.5 million in the first quarter of 2020 and an increase of 36.2% from the fourth quarter of 2020.

*    *    *

- **Net loss** was RMB451.0 million (US$68.8 million) in the first quarter of 2021, representing a decrease of 73.3% from the first quarter of 2020 and a decrease of 67.5% from the fourth quarter of 2020. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB 354.6 million (US$54.1 million) in the first quarter of 2021, representing a decrease of 78.6% from the first quarter of 2020 and a decrease of 73.3% from the fourth quarter of 2020.

25.    August 11, 2021, NIO announced its second quarter 2021 financial results in a press release that stated, in relevant part:

### Financial Highlights for the Second Quarter of 2021

*    *    *

- **Total revenues** were RMB8,448.0 million (US$1,308.4 million) in the second quarter of 2021, representing an increase of 127.2% from the second quarter of 2020 and an increase of 5.8% from the first quarter of 2021.

- **Gross profit** was RMB1,573.9 million (US$243.8 million) in the second quarter of 2021, representing an increase of 402.7% from the second quarter of 2020 and an increase of 1.2% from the first quarter of 2021.

*    *    *

- **Net loss** was RMB587.2 million (US$90.9 million) in the second quarter of 2021, representing a decrease of 50.1% from the second quarter of 2020 and an increase of 30.2% from the first quarter of 2021. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB335.8 million (US$52.0 million) in the second quarter of 2021, representing a decrease of 70.3% from the second quarter of 2020 and a decrease of 5.3% from the first quarter of 2021.

26.    On November 9, 2021, NIO announced its third quarter 2021 financial results in a press release that stated, in relevant part:

### Financial Highlights for the Third Quarter 2021

*    *    *

**Total revenues** were RMB9,805.3 million (US$1,521.8 million) in the third quarter of 2021, representing an increase of 116.6% from the third quarter of 2020 and an increase of 16.1% from the second quarter of 2021.

**Gross profit** was RMB1,993.2 million (US$309.3 million) in the third quarter of 2021, representing an increase of 240.3% from the third quarter of 2020 and an increase of 26.6% from the second quarter of 2021.

*      *      *

**Net loss** was RMB835.3 million (US$129.6 million) in the third quarter of 2021, representing a decrease of 20.2% from the third quarter of 2020 and an increase of 42.3% from the second quarter of 2021. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB 569.7 million (US$88.4 million) in the third quarter of 2021, representing a decrease of 42.9% from the third quarter of 2020 and an increase of 69.7% from the second quarter of 2021.

27.      On March 24, 2022, NIO announced its fourth quarter and full year 2021 financial results in a press release that stated, in relevant part:

**<u>Financial Highlights for the Full Year of 2021</u>**

*      *      *

**Total revenues** were RMB36,136.4 million (US$5,670.6 million) for the full year of 2021, representing an increase of 122.3% from the previous year.

**Gross profit** was RMB6,821.4 million (US$1,070.4 million) for the full year of 2021, representing an increase of 264.1% from the previous year.

*      *      *

**Net loss** was RMB4,016.9 million (US$630.3 million) for the full year of 2021, representing a decrease of 24.3% from the previous year. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB3,006.8 million (US$471.8 million) for the full year of 2021, representing a decrease of 41.2% from the previous year.

28.      On April 29, 2022, NIO filed its annual report on Form 20-F for the period ended December 31, 2021 (the "2021 20-F"), affirming the previously reported financial results.  It also purported to warn of risks related to Weineng, stating in relevant part:

> ***We rely on Battery Asset Company to work together with us to provide Battery as a Service to our users. If Battery Asset Company fails to achieve smooth and***

*stable operations, our Battery as a Service and reputation may be materially and adversely affected.*

On August 20, 2020, we introduced the Battery as a Service, or BaaS, which allows users to purchase electric vehicles and subscribe for the usage of batteries separately. If users opt to purchase a vehicle and subscribe for the battery under the BaaS, they can enjoy a deduction off the original vehicle purchase price and pay a monthly subscription fee for the battery.

*Under the BaaS, we sell a battery to Wuhan Weineng Battery Asset Co., Ltd., or the Battery Asset Company, and the user subscribes for the usage of the battery from the Battery Asset Company.* The service we provide to our users under the BaaS relies, in part, on the smooth operation of and stability and quality of service delivered by the Battery Asset Company, which we cannot guarantee. We invested in the Battery Asset Company with CATL, Hubei Science Technology Investment Group Co., Ltd. and a subsidiary of Guotai Junan International Holdings Limited, which we refer to as the Initial BaaS Investors in this annual report. We and the Initial BaaS Investors each invested RMB200 million and held 25% equity interests in the Battery Asset Company at its establishment. In August 2021, we invested an additional RMB270 million in the Battery Asset Company in connection with its series B financing. As a result of the several rounds of financings of the Battery Asset Company, we currently beneficially own approximately 19.8% of the equity interests in the Battery Asset Company. We refer to the Initial BaaS Investors together with the other investors of the Battery Asset Company that subsequently joined as the Battery Asset Company Investors. As a result, we only have limited control over the business operations of the Battery Asset Company. If it fails in delivering smooth and stable operations, we will suffer from negative customer reviews and even returns of products or services and our reputation may be materially and adversely affected.

Additionally, *given that we generate a portion of our total revenues from sales of battery purchases and provision of service to the Battery Asset Company, our results of operations and financial performance will be negatively affected if the Battery Asset Company fails to operate smoothly*. The Battery Asset Company may finance the purchase of batteries through issuance of equity and debt or bank borrowing. If the Battery Asset Company is unable to obtain future financings from the Battery Asset Company Investors or other third parties to meet its operational needs, it may not be able to continue purchasing batteries from us and providing them to our users through battery subscription, or otherwise maintain its healthy and sustainable operations. On the other hand, if the Battery Asset Company bears a significant rate of customer default on its payment obligations, its results of operations and financial performance may be materially impacted, which will in turn reduce the value of our and the Battery Asset Company Investors' investments in the Battery Asset Company. In addition, in furtherance of the BaaS, we agreed to provide guarantee to the Battery Asset Company for the default in payment of monthly subscription fees from users, while the maximum amount of guarantee that can be claimed shall not be higher than the accumulated

11

service fees we receive from the Battery Asset Company. As the BaaS user base is expanding, if an increased number of default occurs, our results of operations and financial performance will be negatively affected. As of December 31, 2021, the guarantee liability we provided to Battery Asset Company was immaterial.

29.    The 2021 20-F also stated the following about the Company's revenue recognition and net loss:

> We currently generate revenues from (i) vehicle sales, which represent revenues from sales of new vehicles, (ii) sales of automotive regulatory credits, (iii) battery upgrade service, which represents the battery upgrade program for providing incremental battery capacity to the users; (iv) sales of charging piles, including home chargers provided as one of the performance obligations in the contract of vehicle sales, and additional charging piles sold separately, (v) sales of packages, including the sales of our service package and energy package (including charging and battery swapping services), and (vi) other sales, which mainly consist of revenues from sales of accessories, embedded products and services offered together with vehicle sales, and others. Embedded products and services include vehicle connectivity service and extended warranty.
>
> ***Revenue from sales of new vehicles, charging piles, battery upgrade service, automotive regulatory credits and sales of accessories are recognized when controls are transferred.*** For vehicle connectivity services and battery swapping service, we recognize revenue using a straight-line method.

30.    On June 9, 2022, NIO announced its first quarter 2022 financial results in a press release that stated, in relevant part:

> **Total revenues** were RMB9,910.6 million (US$1,563.4 million) in the first quarter of 2022, representing an increase of 24.2% from the first quarter of 2021 and an increase of 0.1% from the fourth quarter of 2021.
>
> **Gross profit** was RMB1,446.8 million (US$228.2 million) in the first quarter of 2022, representing a decrease of 6.9% from the first quarter of 2021 and a decrease of 14.9% from the fourth quarter of 2021.
>
> *        *        *
>
> **Net loss** was RMB1,782.7 million (US$281.2 million) in the first quarter of 2022, representing an increase of 295.3% from the first quarter of 2021 and a decrease of 16.8% from the fourth quarter of 2021. Excluding share-based compensation expenses, adjusted net loss (non-GAAP) was RMB1,309.6 million (US$206.6 million) in the first quarter of 2022, representing an increase of 269.3% from the first quarter of 2021 and a decrease of 25.0% from the fourth quarter of 2021.

31.    The above statements identified in ¶¶ 19-30 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that NIO pulled forward revenue by selling batteries to a related party, which owned the batteries and managed users' subscriptions; (2) that, through the related party, NIO also recognized enormous depreciation savings; (3) that, as a result of the foregoing, the Company's revenue and net loss were overstated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

32.    On June 28, 2022, Grizzly Research published a report alleging that NIO inflated its net income by about 95% through sales to a related party, Weineng.  In sum, the report alleged: that "[b]y transferring the burden of collecting monthly subscriptions to Weineng, NIO has accelerated its revenue growth. Instead of recognizing revenue over the life of the subscription (~7 years), Weineng allows NIO to recognize revenue from the batteries they sell immediately."  The report outlined the scheme to spinoff NIO's Battery-as-a-Service ("BaaS") as an unconsolidated related entity to boost the Company's performance:

> Building upon its Battery Swapping business, NIO introduced "Battery-as-a-Service" to give customers the option to purchase a car without the battery. This structure lowers the total price of the car by at least 70,000 RMB and is supposed to improve EV adoption. Through the program, users can then lease the battery from the BaaS provider, paying 980 RMB-1,480 RMB per month or 11,760 RMB-17,680 RMB annually, depending on the capacity of the batteries rented.

> Below are screenshots from the NIO app which show the reduction in the upfront price and subscription pricing when users opt to rent using BaaS. Our conversation with the salesperson in NIO's EV center also confirmed these two monthly rental prices under the 70/75kWh battery and 100kWh battery selection, respectively.

*       *       *

Given the synergies between Battery Swapping and BaaS, we were puzzled to see NIO spin off the BaaS business as an unconsolidated entity where they have to share economics with other investors. However, after a deeper investigation, the answer appears clear. NIO spun-off Wuhan Weineng to help artificially boost its battery swapping business and overall performance.

According to NIO's filings, Weineng is the entity that owns the batteries used in the BaaS business and is responsible for managing the subscriptions. Thus, when a user subscribes to the BaaS program, Weineng is the recipient of all subscription payments. Where does Weineng get the batteries it provides? None other than NIO...

> "**Under the BaaS, we sell a battery to Wuhan Weineng Battery Asset Co., Ltd., or the Battery Asset Company**, and the user subscribes for the usage of the battery from the Battery Asset Company."

Since Weineng Battery was formed in August 2020, NIO has found it to be a reliable and growing stream of revenue. In just four months of operating in 2020, NIO generated 290 million RMB from sales to Weineng. Despite this quick start, revenue attributable to the entity ballooned even further in 2021 to 4.14 billion RMB representing ~11% of overall 2021 revenue.

The arrangement between Weineng and NIO has helped them in three ways:

1) Pulling forward several years of revenue to help meet ambitious estimates
2) Providing a willing counterparty to sell more batteries than their required network needs
3) Shifting depreciation costs off their financial statements

33.    Specifically, the report alleged, in relevant part:

Since Q4 2020, NIO has surprised net income expectations by an average of 33% while beating top-line estimates by an average of 5%. For FY2021 the Street expected NIO to lose 5,947 million. Instead, NIO posted a net loss of 3,007 million RMB, an amount that was 50% higher than expectations (a difference of 2,940 million RMB). Due to a lack of regularity in Weineng's financial reporting, we can only infer the true effect of the financial engineering between the two companies for the 9 months ended September 2021. From these figures, however, we can see Weineng was crucial to this upside surprise in earnings.

*       *       *

If Weineng did not exist, NIO would have to recognize subscription revenue from customers over the lifetime of their subscription. Luckily for NIO, they don't have to wait... Consider a 70K RMB sale. Normally it would take NIO approximately 7

14

years (inflation-adjusted) to generate the full subscription revenue, but with Weineng, they can recognize the revenue immediately. In other words, **NIO can pull forward approximately 7 years of recurring revenue and recognize it immediately to artificially boost revenue growth without incurring any additional costs.**

We were able to retrieve Weineng Battery's prospectus for an Asset-Backed Financing which revealed key information about its subscriptions. As of September 30, 2021, 19,000 users are serviced under the BaaS service agreement, 18% of which are subscribed to the 100kWh battery BaaS service and 82% to the 70-75kWh battery.

\*        \*        \*

Using these numbers, we can determine what NIO's financials would look like if Weineng did not exist. Contrary to the 2,796 million RMB in revenue reported, NIO would have received roughly 19.84 million RMB per month, or approximately 179 million RMB for the 9 months ending 2021 (~239 million RMB annualized for 2021). Although Weineng never filed any updates to their 2021 Q3 number, the analysis in this report is still very relevant and valid. As of today, NIO is still offering BaaS to its consumers, and Weineng continues to operate as an unconsolidated entity.

\*        \*        \*

| 9M 2021 | # | RMB mil. |
|---|---|---|
| Sales of Goods from Weineng | | 2,796 |
| BaaS Subscribers | 19,000 | |
| Total Batteries Weineng | 40,053 | |
| Real Sales of Goods for BaaS % | | 47% |
| Real Sales of Goods for BaaS RMl (2,796 x 47%) | | 1,326 |
| Revenue without Weineng | | 179 |
| Revenue Pulled Forward | | 1,147 |
| NIO Revenue | | 26,236 |
| % of NIO Revenue | | 4% |
| Net Income Reported | | (1,874) |
| Net Income Adj. | | (3,021) |
| **Variance** | | **61%** |

Source: company filings, Grizzly analysis

\*        \*        \*

Accounting Magic: Shifting Depreciation Costs

Another benefit of creating the Weineng Battery entity is that NIO can realize enormous depreciation savings. According to NIO's 202 20F, the useful life of Charging & Battery Swapping Infrastructure and Equipment (including batteries) is 5 years. Strangely, NIO recently changed the useful to 5-8 years, meaning batteries on the balance sheet depreciate by 15% per year.

Recall NIO's sales to Weineng for the 9 months ending September 2021 were 2.8 billion RMB. We believe almost all of these sales of goods are comprised of battery sales. Assuming 20% margins on this revenue, this would imply the NIO collectively shifted assets that cost 2.25 billion RMB off their balance sheet for the period. This means that these batteries will save NIO up to 336 million RMB for the 9 months ending September 2021 in depreciation costs which directly impacts (and inflates) the company's bottom line.

Coupled with the revenue inflation outlined in previous sections, we estimate Weineng Battery alone can artificially improve NIO's bottom line by over 3 billion RMB. As of the 9 months ending September 2021, NIO's reported a net loss of 1.874 billion RMB. **Without all these accounting shenanigans, NIO's net loss would nearly double to 3.690 billion RMB!**

| 9M 2021 | RMB mil. |
| --- | --- |
| Sales of Goods from Weineng | 2,796 |
| | |
| Revenue Pulled Forward | 1,147 |
| Revenue Fabricated | 1,470 |
| Total Inflated Revenue | 2,617 |
| NIO Revenue | 26,236 |
| % of NIO Revenue | 10% |
| Shifted Battery Depreciation | 336 |
| Total Inflated Net Income | 1,777 |
| Net Income Reported | (1,874) |
| Net Income Adj. Total | (3,651) |
| variance | 95% |

Source: company filings, Grizzly analysis

34.    On this news, the Company's ADSs fell $0.59, or 2.5%, to close at $22.36 per share on June 28, 2022, on unusually heavy trading volume.

35.     Then, on July 11, 2022, NIO announced that it formed a special committee to oversee an investigation into the allegations in the Grizzly Research Report. The Company's press release stated, in relevant part:

> IO Inc. (NYSE: NIO; HKEX: 9866; SGX: NIO) ("NIO" or the "Company"), a pioneer and a leading company in the premium smart electric vehicle market, today announced that following its previous statement in response to the allegations made in a report issued by the short-seller firm Grizzly Research LLC on June 28, 2022 (the "Short Seller Report"), the Company's board of directors (the "Board"), including the audit committee of the Board, after having reviewed the allegations, at the recommendation of the management of the Company and in order to protect the interests of all shareholders, has decided to form an independent committee (the "Independent Committee"), consisting of independent directors Mr. Denny Ting Bun Lee, Mr. Hai Wu, and Ms. Yu Long, to oversee an independent investigation regarding the allegations made in the Short Seller Report (the "Independent Investigation"). The Independent Committee has retained independent professional advisors to assist with the Independent Investigation, including an international law firm and a well-regarded forensic accounting firm.
>
> The Company will provide updates on the Independent Investigation in due course consistent with the requirements of applicable rules and regulations of the Securities and Exchange Commission, the New York Stock Exchange, the Stock Exchange of Hong Kong Limited (the "SEHK") and the Singapore Exchange Securities Trading Limited (the "SGX-ST").
>
> The Company reiterates its continued and unwavering commitment to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with applicable rules and regulations.

36.     On this news, the Company's shares fell $2.03, or 8.9% to close at $20.57 per share on July 11, 2022, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

37.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired NIO securities between August 20, 2020 and July 11, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are

Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

38.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, NIO's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of NIO shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by NIO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

39.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

18

b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of NIO; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

<u>**UNDISCLOSED ADVERSE FACTS**</u>

43.     The market for NIO's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, NIO's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired NIO's securities relying upon the integrity of the market price of the Company's securities and market information relating to NIO, and have been damaged thereby.

44.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of NIO's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially

false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about NIO's business, operations, and prospects as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NIO's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## **LOSS CAUSATION**

46.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.    During the Class Period, Plaintiff and the Class purchased NIO's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

48.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding NIO, their control over, and/or receipt and/or modification of NIO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning NIO, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

49.     The market for NIO's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, NIO's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of NIO's securities and market information relating to NIO, and have been damaged thereby.

50.     During the Class Period, the artificial inflation of NIO's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about NIO's business, prospects, and operations.    These material

misstatements and/or omissions created an unrealistically positive assessment of NIO and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

51.    At all relevant times, the market for NIO's securities was an efficient market for the following reasons, among others:

a)    NIO shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, NIO filed periodic public reports with the SEC and/or the NYSE;

c)    NIO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d)    NIO was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for NIO's securities promptly digested current information regarding NIO from all publicly available sources and reflected such information in NIO's share price.  Under these circumstances, all purchasers of NIO's securities

during the Class Period suffered similar injury through their purchase of NIO's securities at artificially inflated prices and a presumption of reliance applies.

53.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of NIO who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

55.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase NIO's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

57.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NIO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about NIO's financial well-being and prospects, as specified herein.

59.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NIO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about NIO and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

60.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

61.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing NIO's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of NIO's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired NIO's securities during the Class Period at artificially high prices and were damaged thereby.

63.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that NIO was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their NIO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

64.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     Individual Defendants acted as controlling persons of NIO within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

68.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

69.     As set forth above, NIO and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2022                                Respectfully submitted,

                                                                POMERANTZ LLP

                                                                */s/ Jeremy A. Lieberman*
                                                                Jeremy A. Lieberman
                                                                J. Alexander Hood II
                                                                Thomas Przybylowski
                                                                600 Third Avenue, 20th Floor
                                                                New York, New York 10016
                                                                Telephone: (212) 661-1100
                                                                Facsimile: (212) 661-8665
                                                                jalieberman@pomlaw.com
                                                                ahood@pomlaw.com
                                                                tprzybylowski@pomlaw.com

                                                                *Attorneys for Plaintiff*

29

# CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, ___Taras Ceglia Bohonok_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against NIO Inc. ("NIO" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire NIO securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired NIO securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in NIO securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed** <u>9/7/2022</u>
              **(Date)**

DocuSigned by:

*Taras Ceglia Bohonok*

(Signature) 0284C2505F1C46F...


Taras Ceglia Bohonok
          **(Type or Print Name)**

**NIO, Inc. (NIO)**                                                                    **Taras Ceglia Bohonok**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 10/29/2020 | 1 | $30.9075 |
| Purchase | 11/5/2020 | 3 | $41.5590 |
| Purchase | 4/5/2021 | 2 | $40.5100 |
| Purchase | 5/20/2022 | 8 | $16.9200 |